UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

MASSACHUSETTS NURSES
ASSOCIATION

      Plaintiff,

v.

NORTH ADAMS REGIONAL
HOSPITAL

      Defendant

---

Civil No. 05 - 30145 - MAP

## COMPLAINT

### I.    Introduction

1. This is an action under 29 U.S.C. § 185 for confirmation of a labor arbitration award.

2. This court has jurisdiction to hear this complaint under 29 U.S.C. §§ 185(a) and (c) and under 28 U.S.C. § 1331.

### II.    Parties

3. The Plaintiff, Massachusetts Nurses Association (MNA) is a non-profit Massachusetts corporation and a labor organization with a principal place of business at 340 Turnpike Street, Canton, Massachusetts.  MNA represents a bargaining unit of registered nurses (RNs) for the purposes of collective bargaining at North Adams Regional Hospital (Hospital).

4. The Defendant, North Adams Regional Hospital (Hospital) is a non-profit Massachusetts corporation with a principal place of business at Hospital

Avenue, North Adams, Massachusetts. The Hospital employs a bargaining unit of RNs represented by MNA.

### III.    Facts

5.    At times material, MNA and the Hospital were parties to a collective bargaining agreement (the CBA) effective by its own terms from April 1, 2001 to March 31, 2004. The pertinent terms of that CBA continue in effect in a successor contract presently in effect by its own terms from April 1, 2004 to March 31, 2007.

6.    The CBA contained a provision for grievance and arbitration of disputes between the parties at Article 19.

7.    The CBA contained a provision entitled "Standards of Nursing Practice" at Article 18.07. This section contained the following language:

A.    NARH [North Adams Regional Hospital] shall promulgate and enforce policies, rules, and regulations to ensure that applicable professional standards of nursing practice (e.g., E.N.A. Critical Care) are established and carried out so that safe and effective nursing care is provided to patients.

B.    The NARH shall ensure that written policies, procedures and protocols are readily available to nursing staff.

C.    The NARH shall ensure that organizational policies and procedures, job descriptions and standards of nursing practice conform to M.G.L., c. 112, s 74-81B, Board regulations at 244 CMR 2.00-7.00, and all other federal and state laws and regulations related to the practice of nursing.

D.    The hospital will only keep and admit the number of patients that registered nurses can safely care for. The hospital will take measures such as adding nurses, stopping admission or other measures to ensure that this occurs.

2

8.  RNs employed by the Hospital filed approximately nine "Unsafe Staffing Reports" between May 6th and June 2nd, 2002. These reports alleged that staffing on the Hospital's Three North floor was inadequate and unsafe due to factors such as patient census, patient acuity, and RN staffing levels.

9.  The Unsafe Staffing Reports were converted into grievances alleging violations of Article 18.07(D) of the CBA and eventually arbitrated before Arbitrator Michael W. Stutz in hearings held in North Adams, Massachusetts on October 10, 2003, February 3 and 17, 2004, March 16 and 17, 2004, August 30 and 31, 2004, and September 1 and 2, 2004, pursuant to the rules of the American Arbitration Association.

10. The parties stipulated that the issue to be decided by Arbitrator Stutz was

    1)  Did the Hospital violate the collective bargaining agreement as alleged in any or all grievances number one, two, three, four, five, six, seven, ten and eleven?

    2)  If so, what shall be the remedy?

11. Arbitrator Stutz issued his Opinion and Award on February 21, 2005. This Award is attached as Exhibit A hereto.

12. Arbitrator Stutz found that the Hospital violated the CBA as alleged in all of the grievances.

13. Arbitrator Stutz awarded the following remedies:

    a)  The Hospital shall cease and desist violating Article 18.07 of the Agreement;

3

b)    The Hospital shall pay the MNA an amount of money equal to the pay of one RN for each of the nine shifts grieved; and

c)    The Hospital shall pay the RN's working the nine shifts time and one half for those nine shifts, i.e., the difference between time and one half pay and what they actually were paid.

14.    The Hospital has complied with the third above-listed remedy, but not the first (the Cease and Desist order) or the second.

15.    The Hospital has not timely filed to vacate Arbitrator Stutz's award.

16.    Between March 2 and April 22, 2005, RNs employed by the Hospital have identified an additional set of violations of Article 18.07 of the CBA and have filed "Unsafe Staffing Reports" describing those violations.

## Count One, Confirmation Of Arbitrator's Award

17.    MNA re-alleges and incorporates by reference paragraphs 1-16, supra.

18.    The Hospital has failed to comply with the Arbitrator's Award; in particular, the Hospital has failed to Comply with order to Cease and Desist from violating Article 18.07 of the CBA, and with the order to make certain payments to MNA.

19.    Pursuant to 29 U.S.C. § 185, MNA requests that the Arbitrator's Award be confirmed and enforced.

**WHEREFORE**, MNA prays

a)    that judgment be entered in its favor;

b)    that the Court enter an order confirming the Arbitrator's Award;

c)    there being no justification for the employer's failure to comply with the Arbitrator's Award, that the Court direct the Hospital to pay MNA's attorney fees and reasonable costs; and

4

d)  that the Court grant such other and further relief as it
    deems just.

                              Respectfully submitted

                              On behalf of the Plaintiff,
                              Massachusetts Nurses Association

                              By its attorneys

                              _____
                              Alan J. McDonald, BBO #330960
                              Mark A. Hickernell, BBO #638005
                              McDonald & Associates
                              Cordaville Office Center
                              153 Cordaville Road, Suite 210
                              Southborough, MA 01772
                              (508) 485-6600

Date:  June 21, 2005

5

# AMERICAN ARBITRATION ASSOCIATION
## ARBITRATOR'S OPINION & AWARD

Before Michael W. Stutz, Arbitrator

---

In the Matter of Arbitration between

## MASSACHUSETTS NURSES ASSOCIATION

-and-

## NORTH ADAMS REGIONAL HOSPITAL

*Staffing Grievances*
*AAA Case No. 1130-0920-03*

---

## AWARD of the ARBITRATOR

The undersigned arbitrator, having been designated in accordance with the Parties' arbitration agreement, and having duly heard the proofs , allegations and contentions of the Parties, AWARDS as follows:

1. The Hospital violated the collective bargaining agreement as alleged in all of the grievances.

2. The following remedies are awarded:

a) The Hospital shall cease and desist violating Article 18.07 of the Agreement;

b) The Hospital shall pay the MNA an amount of money equal to the pay of one RN for each of the nine shifts grieved; and

c) The Hospital shall pay the RN's working the nine shifts time and one half for those nine shifts, i.e. the difference between time and one half pay and what they actually were paid.

February 21, 2005

_Michael W. Stutz_
Michael W. Stutz

EXHIBIT A

## BACKGROUND

Hearings in this matter were held in North Adams, Massachusetts on October 10, 2003, February 3, 17 2004, March 16, 17, 2004 and August 30, 31, 2004 September 1, 2, 2004 before the undersigned, appointed arbitrator by the parties through the offices of the American Arbitration Association. McDonald and Associates, by Alan McDonald, Esq. appeared on behalf of the Association. The Hospital was represented by the Law Office of Fernand J. Dupere, by Fernand J. Dupere, Jr., Esq. and Russell J. Dupere, Esq. Written closing arguments from both parties were mailed to the undersigned on November 24, 2004. At the request of the arbitrator, the parties agreed that this opinion and award is timely issued on February 21, 2005.

## AGREED ISSUES

The parties submitted the following questions to arbitration:

> 1) Did the Hospital violate the collective bargaining agreement as alleged in any or all grievances number one, two, three, four, five, six, seven, ten and eleven?
>
> 2) If so, what shall be the remedy?

## STATEMENT OF THE CASE

The North Adams Regional Hospital (the "Hospital," "Employer," or "management") and the Massachusetts Nurses Association (the "Association" or "MNA") are parties to a collective bargaining agreement effective from April 1, 2001 to March 31, 2005 (the "Agreement" or "Contract") that provides for the arbitration of disputes between the parties. This case concerns the Association's allegations of unsafe staffing in the medical surgical pediatric unit of the hospital known as "Three North" or "3N."

The Hospital operates as a non-profit in North Adams, a small city of 17,000 located in the northwest corner of the state of Massachusetts. The Hospital operates several departments, including a critical care

2

unit, emergency room, maternity area, psychiatric unit and the medical surgical-pediatric unit, Three North. Three North has 37 beds and serves patients through the full range of ages with varying conditions from patients recovering from minor arthoscopic or other routine surgery to victims of stroke and diabetes, and provides respiratory, dietary and rehabilitative services. Out of the 37 beds, up to seven can be reserved solely for pediatrics, defined as patients 15 to 16 years of age or less. Three North is physically arranged with a central nursing station and two hallways of patient rooms, most with two beds. There is a kitchen, an exam room, showers, and utility rooms.

The parties' Agreement includes provision assuring the safety of patients and employees:

18.07 Standards of Nursing Practice

A. NARH shall promulgate and enforce policies, rules, and regulations to ensure that applicable professional standards of nursing practice (e.g., E.N.A. Critical Care) are established and carried out so that safe and effective nursing care is provided to patients.
B. The NARH shall ensure that written policies, procedures and protocols are readily available to nursing staff.
C. The NARH shall ensure that organizational policies and procedures, job descriptions and standards of nursing practice conform to M.G.L., c. 112, s 74-81B, Board regulations at 244 DMR 2.00-7.00, and all other federal and state laws and regulations related to the practice of nursing.
D. The hospital will only keep and admit the number of patients that registered nurses can safely care for. The hospital will take measures such as adding nurses, stopping admissions or other measures to ensure that this occurs.
[Emphasis supplied]

During the collective bargaining that resulted in the above language, the MNA proposed the following in its Contract proposals dated January 5, 1999:

3

Patient Safety/Sufficiency of Nursing Plan

> NARH shall promulgate and enforce policies, rules and regu-
> lations to assure that every patient of any facility shall, dur-
> ing admission to said facility, be assured of sufficient nursing
> care to provide for said patient's safety and the implementa-
> tion of a plan of nursing care based on applicable profession-
> ally recognized standards of nursing practice.

> Such policies, rules and regulations shall require that a regis-
> tered nurse be designated by the facility at all times during a
> patient's admission to be responsible for the direct nursing
> care of said patient or resident. Such policies, rules and regu-
> lations shall include, but not be limited to, the following pro-
> visions: nursing service, staffing standards and requirements
> for all patient care areas, such standards and requirements
> shall be based on the patient's acuity level and functional ca-
> pabilities as assessed by the registered nurse and applicable,
> professionally recognized standards of nursing practice.

This case concerns the Association's allegations of unsafe staff-
ing/unsatisfactory patient care set forth in nine separate complaints that
were converted to grievances and processed through the grievance pro-
cedure in the Agreement. The grievance at Step Three alleged violation
of Article 18.07(D) by "admitting more patients than nurses can safely
care for."

The Hospital denied the grievance as follows:

> At the grievance hearing the Association refused to state the
> factual situation giving rise to the grievance and the basis for
> its belief that the Agreement has been violated. The Associa-
> tion instead relied on the arguments presented by the Asso-
> ciation Step 1 and 2 of the grievance procedure.

According to Hospital scope of services statement for Three North, ex-
cellent patient care is assured by "maintaining competent staff and a

4

safe environment in which to practice." Hospital polices set forth the following with respect to staffing Three North:

8. Staffing
a. Quantity
- Third North is staffed with sufficient number of RN and LPN personnel to provide an established hour of nursing care to an average daily census and in accordance with patient acuity.
- Acuity levels are determined by the completion of the patient intervention/acuity system. Staffing needs are made/adjusted by the clinical coordinator using the above census information and the professional nurses input as needed.
-Changing acuity levels and/or increased census demanding increased or decreased nursing coverage will be met via intervention of clinical coordinator. Additional staff is provided using part-time/full-time employees and by the use of per diem hospital float personnel. Excess staff will be rotated to other units, offered holiday, vacation. Or hours reduced.
- The Director of Inpatient Care or clinical coordinator is responsible for scheduling nursing staff to provide adequate nursing coverage of patients adhering to the Department of Nursing Policy Staffing Standard. The clinical coordinator makes adjustments to the schedule based on shift needs, patient needs, and other circumstances.

9. Levels
a. Patient care is given by the following nursing skill mix: RN, LPN, NA, occasional private duty nurses (RN/LPN).
b. All patients will be assigned or co-assigned to a RN.
c. All private duty nurses will be co-assigned to a Third North RN.
d. Non-regular staff will be assigned a patient load compatible with their demonstrated competency and will be provided with adequate guidance and support by the unit staff.
[Emphasis supplied]

5

The bargaining unit consists of nurses who are Registered Nurses or "RN's." RN's work with Licensed Practical Nurses ("LPN's") and Certified Nurse Assistants ("CNA's"). Some nursing duties can only be performed by RN's. Diane George, RN, testified that RN's are co-assigned to the patients assigned to LPN's, and must co-sign daily charting on diagnosis.

The Hospital had a "float pool" of nurses at least from 1995 until November 1, 2001, when, according to Mary McConnell, RN, the Hospital stopped assigning nurses to a float pool.

Cheryl Haddad was the Nurse Manager of Third North for about 13 years and she was Director of Medical Surgical Nursing for her last three years until she left the Hospital in 2003. Ms. Haddad testified that she was forced to resign, told that she was "not the leader" that management wanted for the Hospital. Ms. Haddad repeatedly expressed concern about staffing levels to higher management because she believed that the level of care was insufficient to meet patient needs.

Ms. Haddad described a reduction in staffing in 2002 after a consultant was hired to study the issue. Staffing was measured by "care hours" which are determined by dividing the total number of hours worked by RN's and LPN's by the patient census at midnight. The care hour had been around 6.0, but was lowered to 5.5 pursuant to the recommendation of the consultant. This 5.5 level of staffing was in place during the May through June 2002 period of the grievances.

The 5.5 care hour schedule resulted in a reduction of the number or level of licensed staff. For example, a census of 23-25 under the old guidelines called for assignment of four RN's and one LPN. Under the new guidelines, a census of 24 patients was staffed with two RN's and two LPN's, for a net loss of one licensed staff member.

In response to Ms. Haddad's complaints to higher management about staffing on Three North, she was granted an increase in care hour for staffing from 5.5 up to 5.8.

6

Ms. Haddad testified that the trend in the health care industry has been for patients to remain in the hospital for shorter periods of time with the result that the acuity of patients in the hospital has increased. She also testified that the Hospital did not put a patient intervention acuity system in place as required by the Hospital's own policy and recommended by the professional organizations responsible for establishing standards of care. The staffing pattern did not account for any sick days by nurses on the schedule, even though the Contract provides nurses with sick leave and about three absences per week on Three North was normal.

Ms. Haddad testified that due to absences and other factors, she was not always able to find enough nurses to meet the staffing guidelines. Nurses resisted mandatory overtime and they were protected under the Contract from adverse action for declining overtime due to fatigue or illness. Mandated overtime is limited to two hours, and the Hospital has promised in the Contract not to use mandated overtime as a system for staffing the Hospital.

Ms. Haddad described nursing duties on Three North. The arriving nurse receives a report from the last shift. Recently this has been done using a recorded system which saves time but removes opportunity for questions. Nurses check medical records for medicine to deliver and then assemble the meds. Rounds are made to deliver this medication and at the same time assess patients to establish a base line against which to measure any changes during the shift. Admissions and discharges require time to fill out documents and teaching is provided as part of discharges. An admission can take up to two hours. Special situations included IV's, hyper-alimentation, post-operative patients, patients with pain control issues and self-administered pain devices, blood transfusions and diabetic patients. There were also confused and combative patients, patients in restraints and the requirement that patients be educated by nurses about their condition and treatment. Everything must be documented, ideally at once, but at the time of the grievances documentation could only be completed after the shift was over. Nurses have the right to two 15-minute breaks and a half hour unpaid meal, but they often did not have enough time for these breaks.

7

Ruth O'Hearn, RN, grieved her loss of break time and received pay for 37 hours.

Massachusetts General Laws Annotated holds nurses responsible for their patient care:

> Each individual licensed to practice nursing in the common-wealth shall be directly accountable for safety of nursing care he delivers.
> [ALM GL ch. 112 s. 80B, emphasis supplied]

The Association submitted into evidence the professional nursing standards applicable to nurses, including clinical nursing practice, pediatric clinical nursing, and gerontological clinical nursing practice. The clinical nursing practice, revised by a professional Committee on Nursing Practice Standards and Guidelines, defines the standards as:

> Standards are authoritative statement by which the nursing profession describes the responsibilities for which its practitioners are accountable. ... Standards provide direction for professional nursing practice and a framework for the evaluation of practice. Written in measurable terms, standards also define the nursing profession's accountability to the public and the client outcomes for which nurses are responsible.

The above standards set forth extensive duties for nurses.

The Association submitted numerous policies of the Hospital which dictate the nurses' duties.

The Hospital's policy for Assessment and Reassessment of patients requires a "complete head-to-toe assessment" of each patient within two hours of their arrival, to include "physical (cardio/pulmonary, gastrointestinal, genitourinary, neuromusculoskeletal, family systems/functional, risk, nutritional, comfort, skin assessment), spiritual, cultural, and psychosocial status, as well as educational needs." This assessment includes a plan of care and discharge planning. RN's collect and analyze data, whereas LPN's are allowed to do vital signs and

8

take medical histories "as directed by the RN." The 12-page assessment form itself requires broad-ranging documentation, as does the plan of care.

The Discharge Planning Policy describes this function as "complex," and requires the nurse to write up a discharge plan, review it daily, and identify post-hospital services. Nurses must provide discharged patients with instructions for medications and education about their safe and effective use, and teach them about special equipment, the potential for drug and food interactions and how to obtain further treatment.

A policy on the minimum diagnostic workup for pre-op surgical patients on a single page lists all of the information to be gathered and the tests to be performed for patients about to undergo surgery.

The seven-page policy on Patient-Controlled Analgesia (PCA) describes critical monitoring duties of nurses when patients are empowered to administer their own pain medication.

The IV policy describes how to set up intravenous lines under various circumstances. The 7-page policy on Complications requires that nurses monitoring an IV be alert for allergy, infection, infiltration, phlebitis, Thrombus and embolism.

The Hyper alimentation or "HAL" policy sets out the requirements for delivery of nutrition to patients unable to eat.

The Association submitted 12 pages of Hospital policy and forms relating to the transfer of patients. Nurses must be careful to comply with requirements of federal COBRA law. Multiple forms must be completed, including the patient transfer checklist, patient's request/refusal/consent to transfer form and the nursing transfer sheet and guidelines. Separate policy pertains to transfer from Three North to Greylock Pavilion, which is the psychiatric unit.

The Hospital also issued policies on nurses' duty to educate patients, and on medication and administration of IV push meds, which may be administered by certified LPN's.

9

In order to place the nursing profession in context, the Association submitted several documents reporting on studies of the job of nursing.

"Health Care at the Crossroads" by the joint Commission on Accreditation of Healthcare Organizations, reported on the shortage of nurses nationally, and observed that fewer nurses and higher acuity patients is a "prescription for danger." The danger of the profession was described thusly,

> In addition to the administrative and paperwork burdens that they bear, nurses are daily exposed to significant risk to their personal health and safety. Beyond the chronic fatigue, job-related injuries, including needlesticks, back injuries and physical assaults are common experiences on the job.

The report sets forth proposals to solve the shortage of nurses.

The National Institute of Health research by the National Institute of Nursing concluded that more surgical patients die when nurses' caseloads increase.

> Patients in hospitals with the lowest nurse staffing levels (eight patients per nurse) have 31% greater risk of dying than those in hospitals with four patients per nurse. On a national scale, staffing differences of this magnitude could result in as many as 20,000 unnecessary deaths annually.

These findings come from an article "Hospital Nurse Staffing and Patient Mortality, Nurse Burnout, and Job Dissatisfaction" that estimated the impact of increased patient load on burnout and job dissatisfaction as well as patient mortality.

## The Nine Complaints of Unsafe Staffing

Between May 6, 2002 and June 2, 2002, numerous complaints of unsafe staffing were filled out by nurses working Three North. Nine of these complaints have been moved to arbitration and are the subject of

10

this proceeding. Six of these complaints were submitted by Ruth O'Hearn, RN who worked at the Hospital beginning in October 1999. One report each was filed by Doreen Brazeau, RN who has been with the Hospital for 15 years, Colleen LaFrance, an RN with the Hospital for a total of 14 years, and Carmen Lopez, an RN with the Hospital since 1999. A summary of the evidence pertaining to these nine complaints follows.

### May 6, 2002 6p-6a

Ruth O'Hearn, RN reported a patient census of 19, staffing of one RN, one RN from the temporary pool (Linda Arnold), one LPN and two CNA's. The floor lost the unit clerk who was sent to the ER from 11:00 p.m. to 7:00 a.m. Acuity was deemed high by Ms. O'Hearn, with post operative patients, patients receiving blood, incontinent patients requiring two person total care, as well as confused/combative patients. Ms. O'Hearn's report indicates multiple new admits on the 3p-11p shift. Kathryn Hornung, the supervisor notified, promised to make calls, but also said that "7" wasn't too bad. Ms. O'Hearn estimated that four RN's plus three to four CNA's were needed to properly care for these patients.

In her testimony, Ms. O'Hearn explained why she filed this report about May 6, 2002:

> ... with post-op patients the increased level of care, patients receiving blood, the increased time spent at bedside. The incontinent patient, if you have two people doing one patient care that means they are not available to be on the floor for the other eighteen patients. Confused combative patient requires increased supervision to maintain safety.

The admission records for 3N for May 6 show a beginning census of 18, six admissions, two admissions for observation, and an end census of 19. There were a total of 15 admissions and discharges of patients.

11

According to the 5.5 care hour staffing guidelines that were in place at the time, a patient census of 19 patients with average acuity for the evening shift called for two RN's and two CNA's.

Kathryn Hornung, Clinical Coordinator that evening, testified that the staffing was above the grid, and the acuity appeared to be normal for 3N. She also testified that Linda Arnold, the temporary nurse, was one of the more experienced nurses working for the Hospital, and was able to take patient assignments. Ms. Hornung was unable to find another nurse to come in to help out and no patients were transferred off the unit. Ms. Hornung did not recall the actual shift by the time of her testimony at arbitration, and she did not know whether the nurses on 3N were able to provide safe nursing care during the course of that shift according to nursing and Hospital standards. Ms. Hornung testified that there was an RN absent on the evening in question.

### May 9, 2002 6p-6a

Ms. O'Hearn, RN, reported unsafe staffing on this shift staffed by one RN and one temporary RN, along with one LPN and one CNA with responsibility for the care of 24 patients, including two pediatric patients with a high degree of acuity that included the following assignments:

### RN#1 Charge Nurse
<u>8 patients</u>
3 post operative
1 9-month old with parent
1 incontinent with IV
1 9 year old without parent

### RN#2 Traveler
<u>8 patients</u>
1 unstable
2 post operative
Multiple patients with pain issues

### LPN
<u>8 patients</u>

12

1 confused
2 incontinent
1 central line

Ms. O'Hearn notified Joan Middlebrook at 7:00 p.m. who called additional staff, notified Gail Kerwood and the emergency room. 3N was closed to admissions. At 1:00 a.m. the Clinical Coordinator Sandy Foster was notified.

The patient census report for May 9 showed a beginning census of 25, seven patients admitted, three patients admitted for observation for a total of 35 patients available for care. There were a total of 10 patients discharged or transferred out for an end census of 22.

The grid in place at the time for 24 patients for the evening shift called for two RN's, one LPN and two CNA's. The actual staffing was the same as the grid minus one CNA who called out sick. Ms. O'Hearn reported that five RN's and two to three CNA's were required that night.

## May 10, 2002 6p-6a

This report was filed by Ms. O'Hearn. From 6:00 p.m. until 11:00 p.m. the staffing was two RN's, 1 float RN, 1 LPN and 2 CNA's.

From 11:00 p.m. to 7:00 a.m., 1 RN, 2 Float RN's (one of whom took assignment while the other acted as "extra hands"), 1 LPN, 1 CNA and the transport CNA was based on Three North.

The patient census was 21 adult patients and one pediatric patient with overall acuity identified as "average." The notes on Ms. O'Hearn's report state that seven patients per RN "places patients/staff in unsafe situation; not possible to complete assessments, administer meds, document, provide care, reassess, & get done timely."

Jennifer Fitzgerald, Clinical Coordinator, was notified by the nurses of the staffing situation. She mandated a nurse from maternity who was qualified for 3N to transfer over. This nurse filed a grievance. Ms.

13

Fitzgerald explained that an RN called out sick that night and a CNA was off the schedule.

The grid called for two RN's, one LPN and two CNA's on the evening shift for a patient census of 22.

### May 24, 2002 6p-6a

Ms. O'Hearn's report of unsafe staffing/unsatisfactory patient care asserted that the assignments on this shift threatened the health and safety of her and her patients. The patient assignment and staffing was as follows:

### RN#1 Charge Nurse
Six adults
1 two-year old patient without parents
With an IV

### RN#2
No assignment, however total patient census was 19-20, therefore this nurse likely was assigned to six patients, although not indicated on the report.

### RN#3
Six patients
1 admission

There was one transport CNA

### May 25, 2002

Doreen Brazeau, RN reported that during the 6:00 a.m. to 6:00 p.m. shift there were 26 adult patients and one pediatric patient who was two years old, had an IV and no parent present. Four RN's, one LPN was called who arrived at 11:00 a.m. and there were two CNA's. Acuity was identified as high overall. In addition the following special circumstances were identified:
Two orthopedic surgery scheduled for today

14

Two fresh post-ops (less than 24 hours)
Transfer to Baystate at 6:30 a.m.
Three on PCA's with a new procedure
One MRSA isolation
New HAL
Three confused patients
Potential for eight discharges with teaching required.

Admissions were capped and three patients were held in the ER as a result.

On the 6:00 p.m. to 6:00 a.m. shift on May 25, 2002 Ms. O'Hearn reported that there were about 28 patients identified as high overall acuity cared for by two RN's (one from the temporary pool), and two LPN's.

**RN#1 Charge Nurse**
Seven patients
Blood transfusion

**RN#2 Travel Nurse**
Seven patients
One confused patient
One blood transfusion

**LPN#1**
Seven patients
Push pain meds
IV meds
Portacath needle/dsg flush (can only be performed by an RN)

**LPN#2**
Six adult patients
1 two year old patient without parents with an IV

The patient census record for May 25, 2002 shows a beginning census of 24, six admissions and seven discharges. The ending census was 21.

15

Sandra Foster, Clinical Coordinator, testified that in her opinion the staff on this shift could have used another CNA, but she believed that the staffing was not unsafe.

### May 29, 2002 6p-6a

Ruth O'Hearn, RN reported inadequate staffing with a typical census of 25 patients of average acuity who were provided care by two RN's, one LPN and two CNA's. The supervisor capped the patient census at 24 due to the staffing numbers. A post-op patient was placed in maternity. Joan Middlebrook was the supervisor notified. She testified that she called nurses looking for someone to come in and help out, but without success. She said that staffing from evening to night declined while the number of patients went up. As a result, two patients were held in the emergency department.

The staffing was in accordance with the grid. The three nurses (two RN's and one LPN) were each assigned to eight or nine patients.

### May 30, 2002 3p-11p

Carmen Lopez, RN reported 26 patients with high overall acuity were cared for on the second shift by two RN's, one traveling RN, one LPN and two CNA's. Barb Ziemba, LPN and Ruth O'Hearn, RN also signed this complaint. Among the patients were seven post-op, three confused, two demanding. Two RN's had assignments of eight and nine patients. The traveling RN was orienting and therefore, according to policy, unable to take assignment of patients. The LPN had a nine patient assignment.

Kathryn Hornung and Cheryl Haddad were both notified of the situation at 4:30 p.m. They put out calls to everyone without finding anyone willing to respond.

Ms. Lopez testified that there were seven patients just out of surgery ("post-ops") who required more attention.

The post-op patients, you need to manage their vitals and manage them. And then you had confused patients that you need to monitor them and also keep away from the other patients. Then you had the patients that demanded you to be there constantly calling for things that you needed to provide for them.

She also testified that nurses were required to respond to all bells, even from patients with no pressing needs. Ms. Lopez estimated that the patient census and acuity required five nurses (RN or in combination with two LPN's) to give proper care. She was scheduled to work 3:00 p.m. to 11:30 p.m. but came back in and worked until 5:00 a.m. Her coworker Barbara Ziemba took no supper because she didn't have time.

The 3N employee schedule shows only one on vacation and no one calling out.

The patient census report for May 30, 2002 shows a beginning census of 25 with six admissions and one observation. There were five discharges. The ending census was 27.

### June 2, 2002 11p-7a

Colleen LaFrance, RN was the first signature on the report, followed by Candace Rivard, RN and an LPN named Kathleen signed as well, although LPN's are not in the bargaining unit. The report cited insufficient staff for the patient census of 26. There were only three licensed nurses (two RN's and 1 LPN) along with a CNA. Patient assignments were eight, eight and nine patients. One patient was in restraints. There were four confused patients requiring frequent checks, one required a sitter. One patient had a PCA pump requiring checks every two hours.

The nurses notified Joan Middlebrook and Sandra Foster. The report notes their response: "We have asked everyone. We are now capped to admission." Sandra Foster, Clinical Coordinator, agreed that staffing was inappropriate, testifying that there should have been another LPN and one more CNA.

17

The patient census for June 2, 2002 began with 26 patients, showed only three admissions and three discharges, plus one patient who was admitted for observation and one observation patient who was discharged. The end census was also 26.

The grid for 26 patients called for two RN's, one LPN and two CNA's for 6:00 a.m. and then up to three RN's, two LPN's and two CNA's for the day shift.

## Management's response to staffing complaints

The Hospital's clinical coordinators testified that they responded to complaints about inadequate staffing with a series of steps. First, they called about fifteen RN's at home to request that they come in to help out. Then they called the LPN's at home. If these efforts were unsuccessful, they looked elsewhere in the Hospital for someone to transfer over to 3N. Failing that, admissions were capped, patients were held in the emergency department and finally patients might be transferred out to other area hospitals.

Billie Allard, Vice President of Patient Care Services beginning May 9, 2003, testified about changes implemented by the Hospital since the time of the grievances. Ms. Allard said that patient care hours used to determine staffing have been raised to 6.2. Recently a 32-hour RN and a 24-hour RN were added to the 7-3 shift, and a 24-hour RN was added to the 3-11 shift. She also said that they are considering reducing the number of patients assigned to the charge nurse. According to Ms. Allard, a committee has been assembled to develop a system for identifying patient acuity to be used for staffing decisions.

## POSITIONS OF THE PARTIES

**Association:**

The Association argues that Article 18.07 of the Agreement, on its face, requires the Hospital to provide safe and effective care by promulgating and enforcing professional standards of nursing practice. The Association notes that the Hospital's own policies require that 3N comply with the standards of nursing care and practice as defined by nationally recognized associations. Nurses are obliged to provide excellent care and they are legally directed to achieve optimal health for their patients. It is the Association's position that these standards implicitly require that the Hospital afford nurses sufficient time to "full and effectively" perform these services. "...[T]he essential thrust of the MNA's case in this matter: by failing to adequately staff 3N, the Hospital failed to provide adequate time for the nurses to perform key elements of their responsibilities to their patients."

Concerning the nine staffing grievances, the Association contends that they evidence breach by the Hospital's of its obligations to safely staff 3N. The Association argues that context supports this conclusion. Staffing was reduced prior to the grievances, including reduction of the staffing grid from a 6.0 care hour to 5.5. The Hospital had no way to ensure providing even this level of staffing when nurses called in sick or were absent for other reasons, and its efforts to call in overworked nurses and to transfer nurses were routinely futile. Further, the Hospital failed to adopt a system to determine acuity of patients even though its own policies called for such a system. Finally, nurses were chronically unable to take breaks and Ms. O'Hearn was compensated for over 37 hours of lost break time.

The Association argues that its nurse witnesses provided credible, precise and sincere testimony in support of the nine grievances. Further, they were not shown to have a motive them to exaggerate or mislead, rather filing the grievances was against their interests since management discouraged them.

19

The Association also alleges that the testimony of the Hospital's clinical coordinators supported the Association's case because as in each of the nine staffing complaints they "demonstrably accepted the nurses' representations that more staff was needed by calling in or attempting to call in additional help."

As remedy, the Association calls on the arbitrator to award an admittedly "unusual" remedy by directing the Hospital to increase staffing of RN's on 3N. The Association argues that management's steps to increase staffing with the new grid and added nursing time "simply adds low cost ancillary personnel who can perform only a limited portion of the responsibilities important to patient care." The Association asks the arbitrator to give the parties 30 days to negotiate over the number of nurses to be added. Should that be unavailing, the Association asks the arbitrator to direct the Hospital to engage an expert acceptable to the MNA to review and revise the staffing grid for 3N. The Association asks that the arbitrator maintain jurisdiction over disputes related to such a remedy.

**Hospital:**

The Hospital points out that it is a small non-profit organization located in a small city of about 14,000 with about 25 nurses assigned to 3N where the patient census varies from about 15-26 patients. Therefore, the Hospital's goal is to provide quality health care to the community rather than the generation of profits. However, the Hospital is constrained by fiscal realities and must balance competing needs.

The Employer repeatedly argues that it is inappropriate to impose a particular nurse to patient ratio or a staffing level as there is no such provision in the Contract, Hospital policy or the law. Rather, the Contract and policy call for the Hospital when faced with inadequate staffing to try to add nurses or stop admission or transfer patients elsewhere.

Turning to the language of Article 18.07, the Hospital contends that it requires it to promulgate and enforce polices, rules and regulations to provide safe patient care, and the Hospital points to numerous such

20

policies and rules in the record to support its position that it has complied with the Contract.

> The clear contract language and the clear intent of the parties was to ensure that policies, rules and regulations were implemented that would guide nurses as to how to meet the professional standards of nursing, not to provide patient to nurse staffing ratios or minimum staffing levels. If the parties had desired to implement patient to nurse staffing ratios or minimum staffing levels, the parties would have done so in a much more clear and direct manner than that which the Association is suggesting.

The Employer points to the MNA's proposal in bargaining that required the Hospital to implement policies, rules and regulations with "staffing standards and requirements." The Hospital notes that this proposal was not accepted, and argues that the Association in this proceeding is merely seeking to obtain at arbitration that which it failed to obtain in collective bargaining. Instead language with no reference to staffing standards was included in Article 18.07.

The Hospital also argues that national standards do not require minimum staffing levels, or nurse to patient rations or a float nursing pool. The Hospital suggests that the Association's position limited to staffing levels "fails to take into account nurse competency, skill mix and ancillary staff support.

The Hospital points out that the nine grievances amount to only 5% of the 180 shifts during the period of May and June 2002. The Hospital notes that the staffing issues were routinely caused by a sick call from "nursing personnel just prior to the shift, and after calls were made to all nursing personnel, no one was available or willing to come in."

The Hospital notes that most of the grievances were signed by Ms. O'Hearn who also raised staffing issues at her prior job. Further, her suggested staffing included only RN's with no provision for LPN's, and in some cases would have resulted in staffing rations below 5 patients per nurse.

21

The Hospital attacks the grievances as incomplete and inaccurate and asserts that they were used as grievance tools instead of being presented objectively. Further, none of the nurses testified that the staffing resulted in a negative patient outcome. According to the Employer, "if the incident reports were being submitted in an objective fashion they would have included realistic suggested staffing levels, and would have included LPN's as well as RN's." The Hospital argues that Ms. Haddad did not assist the nurses on 3N whereas subsequent clinical coordinators did provide such assistance.

The Hospital also responds that it has increased staffing on 3N by increasing the care hour from 5.5 to 6.2, and by adding 80 nursing hours to the floor. "Therefore, the Hospital has actually increased its staffing above not only the time period when the grievances arose, but also above the staffing which existed prior to said period." Also the Hospital is developing a system to determine patient acuity on 3N. According to management, "... the Hospital has also listened to the nurses' concerns and has attempted to address their concerns in a variety of ways."

Finally, the Employer argues that an award requiring increased staffing and/or the addition of a float nursing pool would exceed the authority of the arbitrator and change the terms of the Contract. Further, such an award is not required by the evidence in the record. Rather, the evidence establishes that policies, rules and regulations set forth management's response to inadequate staffing. The Hospital suggests that the nine grievances represent "a few identified situations over a brief period of time, which was considered by the Association to be the worst staffing period." According to the Hospital, "It is financially impossible and unrealistic to staff so that every conceivable circumstance that may occur will always be met at an optimum staffing leveling the opinion of every nurse on the unit." The Employer asks that the MNA grievances be denied.

22

## OPINION

This arbitration results from nine grievances[1] filed by the Association concerning unsafe staffing at the Hospital's Medical Surgical unit known as "Three North" or "3N." Resolution of these grievances requires interpretation of the parties' Agreement, finding of facts with respect to the nine grievances and application of the Agreement to these facts. In view of my conclusion that the Hospital violated the Agreement, a remedy then must be fashioned.

In Article 18.07(D), the Hospital assures nurses that it will "only keep and admit the number of patients that registered nurses can safely care for," and further promises to add nurses, stop admissions or take other measures to protect nurses from assignment to a number or acuity of patients that is more than can be safely cared for.

Article 18.07(A) requires the Hospital to promulgate and enforce policies applying professional nursing standards "so that safe and effective nursing care is provided to patients." This provision evidences management's agreement to respect and apply the professional nursing standards to the practice of its nurses on 3N.

Reading these two provisions of Article 18.07, the parties expressed an intent to assure nurses that their professional standards will be respected and that nurses will not be assigned to a greater number or acuity of patients than they can safely care for. Should census or acuity threaten to become too high, then management must correct the situation by adding nurses, stopping admissions or taking other measures to ensure that nursing assignments remain within safe parameters.

Nurses are subject to established professional standards that define proper nursing practices. The Standards of Clinical Practice, for exam-

---

[1] The Contract broadly defines a grievance as a "complaint or dispute between the Hospital and the Association pertaining to the interpretation of, application of, or compliance with the provisions of this Agreement." The Association printed up the complaint forms which are entitled "Objection and Documentation of Unsafe Staffing/Unsatisfactory Patient Care." The form provides space for nurses to document complaints about staffing or patient census and acuity when they feel unsafe as the result. It is undisputed that these objections when they are pressed forward for resolution by the Association amount to grievances.

23

ple, include the following basic standards of care: assessment, diagno-
sis, outcome identification, planning, implementation and evaluation.
These standards of care include measurement criteria and documenta-
tion. In order for nursing practice to meet these professional standards,
it is beyond dispute that nurses must have a patient assignment load,
including numbers and acuity, that allows sufficient time to meet all of
the basic standards of care.

In addition to professional standards, nurses are subject to Massachu-
setts State law which holds them directly accountable for delivery of
safe nursing care. [ALM GL ch. 112 s. 80B]

In the nine grievances at issue, the reporting nurses assert that the
numbers and/or acuity of patients were greater than they could safely
handle. The grievances complained of assignments that pose threats to
their own health and safety, as well as the safety and well-being of
their patients. On many of the grievance forms the nurses reported that
overall patient acuity was high.

The Hospital policies require a system to determine acuity of patients,
but this system has not been implemented. At least at the time of the
grievance, there was no acuity system in place that management con-
sulted, although there was testimony that nurses had their own num-
bering system 1-3 based on how much care each patient required.
Since management has to account for acuity in making shift assign-
ments at 3N, acuity apparently was communicated informally from the
floor to the coordinators to enable management to adjust for acuity and
census. But the failure to set up the system created conditions that al-
lowed excessive patient census and acuity to develop. Such a system
has been promised and should now be in place.

Each of the grievances will be considered, but first let me observe that
the grievants presented themselves as professional nurses who genu-
inely believed that on the occasions of the grievances management as-
signed excessive patient census and acuity creating unsafe conditions
to practice their profession. Although management did not concede the
case, the testimony of the Employer's witnesses largely supported the

24

grievance reports that census and/or acuity were higher than they should have been on most if not all of these nine occasions.

Although the Hospital largely explained away the nine grievances as unfortunate incidents that were in part the fault of nurses who declined requests that they work overtime, the Hospital also asserted that these instances were from a former era when other managers applied a staffing grid based on a 5.5 care hour staffing standard that has now been replaced by a grid with a higher 6.2 care hour standard. I agree with the Hospital that the Contract does not require a rigid patient/nurse ratio nor does it explicitly require the Hospital to maintain a float pool of nurses. Rather, for the Hospital to comply with Article 18.07, it must administer staffing, patient load and acuity in a manner that assures nurses that they will not be forced to work under dangerously overloaded conditions. The Hospital has numerous tools available to it to enforce such a system, including adding staff, capping admissions, and transferring patients out of the Hospital.

### May 6, 2002 6p-6a

On this date, two RN's and one LPN cared for a patient census of around 19. Although Ms. Hornung was quoted as saying that the case load was not too bad, Ms. O'Hearn disagreed and explained that she filed her reports when the patient census or acuity did not allow the nurses to meet their professional and Hospital standards.

Looking at this grievance for May 6, 2002 nearly three years later, even after considering the testimony of live witnesses whose memories were faded by the passage of time, it is difficult to know what Ms. O'Hearn and her colleagues really faced. However, Ms. O'Hearn credibly asserted that heightened patient acuity meant that staffing was unsafe on the occasions that she filed reports. She believed that four nurses were required to provide care safely for the patients given their acuity that night. Considering the multiple admissions, post-op patients, patients receiving blood, incontinent patients requiring two-person total care, and confused/combative patients, I accept Ms. O'Hearn's allegation that nursing care by two RN's and one LPN on this shift was insufficient to safely care for the 19 patients under ac-

25

cepted nursing standards. According to Ms. O'Hearn's report, man-
agement agreed that another nurse would have improved conditions
since they promised to try to call one in.

### May 9, 2002 6p-6a

This shift was plainly not a good working period at Three North for the
two RN's and one LPN who were assigned to provide care for 24 pa-
tients, many with heightened acuity. Considering the eight patients as-
signed to each nurse and the list of extraordinary acuity that each han-
dled, along with the Hospital's unsuccessful efforts to find additional
staff, the conclusion is inescapable that the staffing on 3N on this shift
was unsafe, as alleged by Ms. O'Hearn.

### May 10, 2002 6p-6a

Although acuity was reported by Ms. O'Hearn as normal, 21 adult pa-
tients and one pediatric patient were under the care of four nurses with
two CNA's. After 11:00 p.m., staffing was reduced to only two RN's,
plus an RN who took no assignment but helped, and one LPN. Ms.
O'Hearn charged in her grievance that admissions continued with staff
not in place or inadequate with only one RN and one LPN and one
CNA for awhile. She wrote that seven patients per nurse was an unsafe
situation.

From all the scrambling to staff up the 11:00 p.m. to 6:00 p.m. shifts,
and Ms. O'Hearn's report and testimony, I am persuaded that an un-
safe staffing situation existed during which nurses were unable to work
up to their professional standards.

### May 24, 2002 6p-6a

Ms. O'Hearn was responsible for six adults plus a two-year old with an
IV and no parent. Ms. O'Hearn testified that her care for this child un-
der these circumstances was "fragmented" and that she was unable to
document until the end of the shift. Ms. O'Hearn said she did not have
time to teach patients as required by professional nursing standards.

This evidence shows another unsafe situation for the nurses on Three North.

## May 25, 2002 6a-6p

On this morning to evening shift, Doreen Brazeau, RN reported that a census of 26 adults and one pediatric patient (a two-year old with IV and no parent) were not safely cared for by the staff of four RN's and two CNA's. She reported that the acuity was heightened, including one patient with a central line, one with a portable catheter, three with PCA's with a new procedure, two fresh post-ops, and three confused patients along with the potential for eight discharges that required teaching. Ms. Brazeau reported that a new patient was admitted against the advice of staff.

This staffing created a patient to nurse ratio of 6.7: 1. The heightened acuity of other patients along with the two-year old child, and the possibility of many discharges, persuades me that an unsafe situation existed as alleged in the grievance. Even the clinical coordinator's notes said, "Not enough staff for acuity."

## May 25, 2002 6p-6a

Ms. O'Hearn reported high acuity in a patient census of 28 with two RN's and two LPN's working. There were no CNA's, although one was in the building somewhere. Since LPN's have limitations on their practice, the RN's must be responsible for some care of their patients.

Considering this report and the testimony of Ms. O'Hearn, I find that the staffing on this shift did not comply with the Contract.

## May 29, 2002 6p-6a

Two RN's and one LPN handled care for 25 patients of average acuity. Ms. O'Hearn alleged that she was unable to safely care for the patients assigned. Despite staff complaints, another patient was admitted to the floor. Two more patients were held in the emergency department.

27

This census resulted in more than seven patients per nurse. Mr. O'Hearn estimated that four RN's could have safely handled the caseload. With only two RN's and one LPN, patient care on this shift did not comply with the Contract.

### May 30, 2002 3p-11:30p

Carmen Lopez, RN reported high acuity in a patient census of 26 with two RN's and one LPN taking patient assignments. Another RN was orienting. Ms. Lopez reported patients post-op, confused, demanding. Ms. Haddad tried to bring in another nurse without success.

The nine patient assignments with heightened acuity plainly created an unsafe situation in violation of the Contract.

### June 2, 2002 11p-7a

Colleen LaFrance, RN reported unsafe staffing on this shift with two RN's and one LPN caring for 26 patients, two of whom needed a sitter, but only one sitter was available. A confused patient needed frequent checks and one patient was in restraints. Patient assignments to nurses were eight, eight and nine. Management tried without success to call in nurses, and it capped admissions.

Again, the documentation and testimony establish that the census, acuity and staffing on this shift violated the collective bargaining agreement.

### Conclusion

The nine grievances established that the Hospital violated Article 18.07 on these occasions by failing to add staff or limit patient admissions to numbers that the nurses could safely care for.

28

## Remedy

The purpose of remedy for breach of contract is to put the injured party in as good a position as they would have been but for the violation of the contract. In this case, the Association was injured because unsafe staffing was allowed by the Hospital to occur without cropping admissions or transferring patients and without adding another nurse. Individual nurses were injured by having to work under unsafe conditions.

Obviously, the remedy is problematic because the unsafe situations that occurred in the past, now long ago, cannot be made to disappear from memory, nor can the risks taken by the nurses be erased. The Association seeks the hiring of more nurses to remedy something that transpired nearly three years ago and that may not be continuing today. The time has not yet come for such an extraordinary remedy. Rather, I will try to identify the injuries and devise reasonable remedies to address them.

The Hospital breached the Contract by failing to either cap admissions, transfer patients to another facility or bring in more nursing staff. Since the Hospital chose to assign excessive patients or acuity to the grieving nurses, additional staff should have been brought in to work. Therefore, the Association's bargaining unit lost wages that should have been paid to care for the excess patient load or acuity of patients. To address this wrong, the Association will be awarded wages of one RN for each of the nine shifts.

The nurses who worked the shifts in question performed their duties under unsafe conditions that placed them in some professional jeopardy. Although not an adequate remedy, the nurses will be compensated for these risks with additional wages. The Contract provides for overtime pay of time and one half when nurses must work extra hours. The RN's who worked the shifts in question will be paid the difference between the wages they received and overtime rates of pay.

Finally, the most important goal of remedy in this case is assure that there is no repetition of the circumstances that prevailed on at least

29

nine occasions in May and June 2002 on Three North. Therefore, I will
issue a cease and desist order.

February 21, 2005

Michael W. Stutz

30

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Massachusetts Nurses Association

### DEFENDANTS
North Adams Regional Hospital, Inc.

**(b)** County of Residence of First Listed Plaintiff  **Norfolk**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed  **Berkshire**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Mark A. Hickernell    (508) 485-6600
McDonald & Associates
153 Cordaville Road, Suite 153
Southborough, MA  01772-1834

Attorneys (If Known)    (413) 527-4716
Fernand J. Dupere, Jr.
223 College Highway
P.O. Box 373
Southampton, MA  01073

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

|  | PLF | DEF |  | DEF |  |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product      Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability / ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &      Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of | Slander / ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ Judgement Medicare Act | ☐ 330 Federal Employers'      Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability      Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine / **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product / ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability / ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle      Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability / ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury      Product Liability | ☒ 720 Labor/Mgmt. Relations | ☐ 863 DIW C/DIW W (405 (g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment      Sentence | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/      Habeas Corpus: | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | Determination Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations / ☐ 530 General | | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare / ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights / ☐ 540 Mandamus & Other | Security Act | 26 USC 7609 | State Statutes |
| | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
another district
(specify)

☐ 6  Multidistrict
Litigation

☐ 7  Appeal to
District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

Confirmation of arbitration award under 29 U.S.C. §185

## VII. REQUESTED IN
COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY
(See
instructions):
JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE  305976          MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) __Massachusetts Nurses Association v.__
North Adams Regional Hospital, Inc.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See
local rule 40.1(a)(1)).

| | | |
|---|---|---|
| ☐ | I. | 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT. |
| ☒ | II. | 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, |
| | | 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. |

\*Also complete AO 120 or AO 121
for patent, trademark or copyright cases

| | | |
|---|---|---|
| ☐ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, |
| | | 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, |
| | | 380, 385, 450, 891. |
| ☐ | IV. | 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, |
| | | 690, 810, 861-865, 870, 871, 875, 900. |
| ☐ | V. | 150, 152, 153. |

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in
this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
YES ☐     NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See
28 USC §2403)
YES ☐     NO ☒

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
YES ☐     NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
YES ☐     NO ☒

7. Do **all** of the parties  in this action, excluding governmental agencies of the united states and the Commonwealth of
Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? -  (See Local Rule
40.1(d)).
YES ☐     NO ☒

A. If yes, in which division do all of the non-governmental parties reside?
Eastern Division ☐     Central Division ☐     Western Division ☐

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental
agencies,  residing in Massachusetts reside?
Eastern Division ☒     Central Division ☐     Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If
yes, submit a separate sheet identifying the motions)
YES ☐     NO ☐

(PLEASE TYPE OR PRINT)     Mark A. Hickernell, BBO #638005
ATTORNEY'S NAME ____McDonald & Associates____
ADDRESS 153 Cordaville Road, Suite 210, Southborough, MA  01772-1834
TELEPHONE NO. ____(508) 485-6600____

(Coversheetlocal.wpd - 10/17/02)